FILED
2024 Aug-01  AM 11:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| DENNIS RICKY FRASIER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  4:23-cv-00415-HNJ |
| | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Dennis Ricky Frasier seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner") regarding his claim for a period of disability and disability insurance benefits.  (Doc. 1).  The undersigned carefully considered the record, and for the reasons expressed herein, the court **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.  The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate judge conduct any and all proceedings, including the entry of final judgment.  (Doc. 16).

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).  To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process.  *See* 20 C.F.R. § 404.1520(a)(4).  The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five if the evaluation proceeds that far.  *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity.  20 C.F.R. § 404.1520(b).  Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ."  *Id.* at § 404.1520(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 1.00-114.02.  *Id.* at § 404.1520(d).  If a claimant's impairment meets the applicable criteria at this step, that claimant's impairment would

prevent any person from performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525. That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment. *See Williams v. Astrue,* 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience." (citing 20 C.F.R. §§ 404.1520, 416.920; *Crayton v. Callahan,* 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work. 20 C.F.R. § 404.1520(e). At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work. *See id.* § 404.1520(a)(4)(iv). If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled. *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education, and past work experience, that the claimant can perform other work. *Id.* § 404.1512(b)(3), 404.1520(g). If the claimant can perform other work, the evaluator will not find the claimant disabled. *See id.* § 404.1520(a)(4)(v); *see also id.* § 404.1520(g).

If the claimant cannot perform other work, the evaluator will find the claimant disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'" *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). Indeed, "an ALJ's factual findings … 'shall be conclusive' if supported by 'substantial evidence.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019) (citing 42 U.S.C. § 405(g)). Although the court must "scrutinize the record as a whole … to determine if the decision reached is reasonable … and supported by substantial evidence," *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ. "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence … is 'more than a mere scintilla,' … [and] means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154 (citations omitted). Therefore, substantial evidence exists even if the evidence preponderates against the Commissioner's decision. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Frasier, age 63 at the time of the ALJ hearing, filed an application for disability and disability insurance benefits on January 22, 2021, alleging disability as of July 29, 2020. (Tr. 188-201). The Commissioner denied the application. (Tr. 93-97). Frasier requested reconsideration, which the Commissioner also denied. (Tr. 103; 104-113). Barber timely filed a request for hearing before an administrative law judge on November 29, 2021. (Tr. 114). On May 18, 2022, the ALJ held a hearing. (Tr. 36-56).

The ALJ issued an unfavorable decision denying Frasier's claim on August 26, 2022. (Tr. 17-35). Applying the five-step sequential process, the ALJ found at step one that Frasier had not engaged in substantial gainful activity since the alleged disability onset date. (Tr. 22). At step two, the ALJ determined Frasier manifested the severe impairments of coronary artery disease, atrial fibrillation, obesity, and diabetes. (Tr. 22). However, the ALJ determined the claimant's alleged migraines/primary headache disorder and low back pain could not be established as medically determinable impairments. (Tr. 23).

At step three, the ALJ concluded Frasier did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments—specifically, sections 1.15 (disorders of the skeletal spine resulting in compromise of a nerve root), 1.16 (lumbar spinal stenosis resulting in compromise of the cauda equina), 4.02 (chronic heart failure), 4.04 (ischemic heart disease), and 9.08 (diabetes mellitus)—in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 23).

At step four, the ALJ found Frasier exhibited the residual functional capacity ("RFC") "to perform medium work as defined in 20 C.F.R. 404.1567(c) except [that] he could frequently stoop, crouch, crawl, knee[ll]"; "perform no climbing of ladders, ropes, [or] scaffolds"; and "avoid unprotected heights." (Tr. 24). In so finding, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (Tr. 24). To this end, the ALJ found "[t]he claimant's description of disabling pain and other limitations … [were] not entirely consistent given the reports from examining practitioners, objective, clinical findings on examination and his admitted activities of daily living." (Tr. 25). Given the afore-cited RFC, the ALJ deemed Frasier unable to perform any past relevant work since the alleged onset date. (Tr. 28).

Finally, taking Frasier's age, education, work experience, and RFC into account at step five, the ALJ concluded Frasier could perform a range of jobs that existed in significant numbers in the national economy—including hand packager, assembler of auto parts, and linen room attendant. (Tr. 29). Therefore, the ALJ concluded Frasier "was not under a disability … at any time from … the alleged onset date [to] … the date last insured." (Tr. 30).

Frasier filed a request for review of the hearing decision. (Tr. 185-187). On February 7, 2023, the Appeals Council denied Frasier's request for review, which deems the ALJ's decision the Commissioner's final decision. (Tr. 1-6). Frasier filed his Complaint in the present case on April 3, 2023. (Doc. 1).

## ANALYSIS

In this appeal, Frasier argues the ALJ's RFC determination does not rest on substantial evidence. (Doc. 13 at 6). Specifically, Frasier contends "[t]he ALJ did not properly consider the evidence and his determination was based on an erroneous mischaracterization of and selective treatment of the records." (*Id.* at 7-8). Moreover, he claims the ALJ "improperly dismissed the qualifying limitations the Plaintiff placed on many of [his] activities [of daily living]." (*Id.* at 11). For the reasons stated herein, the undersigned disagrees.

To determine if a claimant can perform his past relevant work at step four or other work at step five, the ALJ must assess the claimant's RFC—the most a claimant can still do despite the physical and mental limitations resulting from his impairments. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404. 1520(e); *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004) (superseded by statute as stated in *Portwood-Braun v. Commissioner of Social Security*, No. 22-11491, 2023 WL 2417856 (11th Cir. Mar. 9, 2023)). The ALJ must base its decision on all relevant evidence in the record, including medical history, medical signs and laboratory findings, the effect of treatment including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, and side effects of medication), daily activities, lay evidence, recorded observations, and medical source statements. *See* SSR 96-8p, 1996 WL 374184, at *5 (1996); 20 C.F.R. § 404.1545(a)(3).

When a claimant, as here, attempts to establish disability through his own

testimony of pain or other subjective symptoms,

> [he] must satisfy two parts of a three-part test by showing: "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain."

*Zuba-Ingram v. Comm'r of Soc. Sec.*, 600 F. App'x 650, 656 (11th Cir. 2015) (quoting *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (per curiam)).  A claimant's testimony coupled with evidence that meets the pain standard "is itself sufficient to support a finding of disability."  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citations omitted).

Social Security Ruling ("SSR") 16-3p, effective March 28, 2016, and republished October 25, 2017, eliminates the use of the term "credibility" as it relates to assessing the claimant's complaints of pain and clarifies that the ALJ "will consider any personal observations of the individual in terms of **how consistent** those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file."  SSR 16-3p, 2017 WL 5180304, *7 (Oct. 25, 2017).  An ALJ rendering findings regarding a claimant's subjective symptoms may consider a variety of factors, including: the claimant's daily activities; symptom location; duration, frequency, and intensity; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; and other factors concerning functional limitations and restrictions due to symptoms.  *See* C.F.R. § 404.1529(c)(3), (4).

SSR 16-3p also clarifies the ALJ's burden when discrediting a claimant's subjective symptoms: "[I]t is not sufficient … to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.'  It is also not enough … simply to recite the factors described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  2017 WL 5180304 at *10; *see also Wilson*, 284 F.3d at 1225 (If an ALJ discredits a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so.").

At the evidentiary hearing on May 18, 2022, Frasier testified he worked for Goodyear for thirty-two years.  (Tr. 42).  At the time he left the company, he worked as a non-powered mechanic, which entailed hauling and installing non-motorized equipment.  (*Id.*).  Frasier testified he decided to retire because of back pain and a series of stents.  (*Id.*).  As of the date of the hearing, Frasier possessed five stents in his heart. He stated his cardiologist would conduct a stress test in subsequent days which would likely result in another stenting procedure.  (Tr. 43).  To this end, Frasier stated: "I'm getting where I can't breathe again and that's usually a sign it's happening…."  (*Id.*). When asked about the symptoms associated with his heart, Frasier replied, "I'm in atrial

[fibrillation] all the time…. [I]t's been this way for 20 years and I've just managed.  But they said as I got older, the medicine and the atrial fib would bother me more…. [My heart] will run away and it feels like you worked two days in 20 minutes…." (*Id.*).  He stated he takes baby aspirin and warfarin, but he recently stopped taking Plavix.  (Tr. 44).

Regarding his type II diabetes, Frasier testified he checks his blood sugar four times a day.  (*Id.*).  He explained he contracts a headache and "just sit[s] in [a] chair all day" when his blood sugar climbs too high.  (Tr. 45).  Regarding his back pain, Frasier testified "it hurts to bend over." (*Id.*).  He also explained he cannot easily lift his arms over his head.

Next, Frasier explained he could stand or walk for about thirty minutes to an hour before stopping to rest.  Further, he testified his day normally "consists of about, if I get out and try to do anything, three or four hours, and most of that rising in a truck or something…. And then I come home and set in the house and this heat has got me going out for an hour or so in the morning and then coming in 'til 7:00 at night, in the evening." (Tr. 46).  He estimated he could lift and carry 35 or 40 pounds comfortably. (*Id.*).  He testified he checks on his cattle but tells his younger family members "what they need to do and where." (Tr. 47).  Frasier said he typically dozes on and off during the day and struggles to sleep at night.  (Tr. 48).  He testified he receives $300 a month for working on the board of directors of his local water board.  (Tr. 48-49).

On June 22, 2020—about a month prior to the alleged onset date—Frasier filled

out a Function Report form.  (Tr. 240).  Frasier's reported daily activities included waking up at 7 a.m., drinking coffee, checking on cattle, watching television, eating, and going for a walk with his grandchildren.  (*Id.*).  He noted feeding his pets and other animals with the help of his wife.  (Tr. 241).  Frasier stated his "sugar makes him go to the restroom every two hours all night long."  (*Id.*).  He reported sweeping the floor for 20 minutes and mowing for an hour.  (Tr. 242).  In addition, he recounted going outside daily, helping at church weekly, and hunting and fishing monthly.  (Tr. 243-44).  Frasier reported difficulty lifting, squatting, kneeling, stair climbing, and seeing.  (Tr. 245).  He explained he could walk a quarter of a mile before needing to stop and rest for 5 minutes.  (*Id.*).  He observed his "heart runs away" in periods of stress.  (Tr. 246).

On the same day, Frasier completed a cardiovascular questionnaire.  (Tr. 248). Frasier reported walking daily for exercise.  (*Id.*).  He estimated it would take him ten minutes to walk a quarter of a mile.  (*Id.*).  Frasier stated he experienced discomfort with exercise at his last nuclear stress exam.  (*Id.*).  He stated he required a cooling off period of twenty to thirty minutes to relieve discomfort.  (Tr. 249).  Moreover, Frasier asserted chronic fatigue causes him to experience shortness of breath.  (*Id.*).  He reported using two puffs of an inhaler as needed when shortness of breath occurs.  (*Id.*).  Frasier recounted waking up once a month with shortness of breath.  (*Id.*).

According to a work history report, Frasier worked from 1980 to 2017 at Goodyear Tire.  (Tr. 252).  He described cleaning and installing wheels and other parts. (Tr. 253).  The job typically required 2 hours of walking, 7 hours of standing, 1 hour of

sitting, 1 hour of climbing, 20 minutes of crouching, and daily handling of big and small objects.  (*Id.*).  Frasier recounted lifting 20-pound wheels two at a time approximately 5 to 6 times a day.  (*Id.*).

Frasier filled out another Function Report form on February 17, 2021.  (Tr. 279). He stated his conditions limited his ability to work because his "heart runs away" and he runs "out of bre[a]th."  (*Id.*).  Frasier listed his typical daily activities as watching television, staying home due to the COVID-19 pandemic, and walking outside.  (Tr. 280).  He reported feeding his dog.  (*Id.*).  Frasier stated he could no longer cut hay, bale hay, feed the cows, or mend fences due to his conditions.  (*Id.*).  In addition, he stated he could no longer sleep because he had to use the restroom every two hours.  (*Id.*). Frasier's wife reportedly prepared meals, and Frasier's wife and children performed house and yard work.  (Tr. 281).  Frasier reported "try[ing]" to go outside and watching television daily.  (Tr. 282-83).  In addition, he reported frequently falling asleep.  (Tr. 283).  Frasier listed attending socially-distanced church as one of his social activities. (*Id.*).  He reported difficulty lifting, squatting, bending, standing, reaching, kneeling, hearing, and stair climbing.  (Tr. 284).  He explained he could walk 100 yards before needing to stop and rest for two to three minutes before resuming.  (*Id.*).

In his opinion, the ALJ summarized Frasier's hearing testimony regarding his symptoms.  The ALJ determined "[t]he claimant's description of disabling pain and other limitations … [were] not entirely consistent" with "the reports from examining practitioners, objective, clinical findings on examination and his admitted activities of

daily living." In so finding, the ALJ did not improperly discredit Frasier's subjective complaints. The ALJ satisfied the Eleventh Circuit pain standard by stating Frasier's medically determinable impairments could reasonably be expected to produce some of the symptoms he alleged, yet Frasier's descriptions regarding the disabling extent of his symptoms did not entirely accord with the medical evidence of record. (Tr. 25). The ALJ detailed Frasier's medical evidence from July 2018 to March 2022 to support his decision, highlighting records indicating Frasier routinely exhibited unlabored breathing; normal muscle strength, coordination, and sensation; and few reports of fatigue. (*Id.*). In addition, the ALJ pointed to a normal nuclear stress test and relatively quick recoveries from stenting procedures. (*Id.*). The ALJ adequately articulated these findings, and substantial evidence supports his findings.

In determining whether a claimant was disabled under the aforementioned pain standard, an ALJ may consider evidence from before or after the relevant period between the alleged onset date of his disability and the date last insured, so long as the information bears on the claimant's disability during the relevant time. *Douglas v. Commissioner of Soc. Sec.,* 486 Fed. App'x 72, 75 (11ᵗʰ Cir. 2012) ("[The ALJ] properly applied this circuit's pain standard, taking into account evidence during the relevant period. He also considered evidence from before and after the relevant period that would have bearing on Douglas's disability during the relevant time."). To this end, the full medical record—including those pre-dating the alleged onset date and post-dating the date last insured—demonstrate Frasier's symptoms stemming from his coronary

artery disease, atrial fibrillation, obesity, and diabetes mellitus remained relatively controlled throughout the relevant period.

Trinity Medical Clinic (hereinafter "TMC") primary care records from June 28, 2016 to June 19, 2018 reflect normal, consistent findings.  On July 6, 2016; August 17, 2016; October 26, 2016; October 19, 2017; March 13, 2018; and June 19, 2018, Frasier reported "no chest pain, no arm pain on exertion, no shortness of breath when walking, no shortness of breath when lying down, no known heart murmur, no lightheadedness, no calf or jaw pain, and no ankle edema."  (Tr. 391, 395, 399, 411, 417, 422-23).  On November 29, 2016, Frasier reported "no chest pain, no arm pain on exertion, no shortness of breath when walking, and no shortness of breath when lying down."  (Tr. 408).  On February 2, 2017, Frasier reported "no chest pain, no arm pain on exertion, and no shortness of breath when walking."  (Tr. 405).  On October 19, 2017, Frasier reported fatigue.  (Tr. 399).  In addition, the physician assessed low back pain.  (Tr. 400).

On September 19, 2016, the examining physician assessed Frasier's A1C at 7.8%.  (Tr. 415).  Frasier's A1C also measured 7.8% on March 3, 2018.  (Tr. 396).  On June 19, 2018, Frasier's A1C level rose to 8.3%.  (Tr. 392).   That said, the examining physician labelled Frasier's diabetes mellitus without complications.  (Tr. 391, 395, 399, 402, 406, 408, 411, 415, 418, 420, 423, 425).

In the foregoing encounters (plus additional encounters dated July 26, 2016; September 19, 2016; and July 14, 2017), Frasier appeared healthy, well-nourished, and

well-developed.  (Tr. 391, 395, 399, 402, 405, 408, 411, 414, 417, 420, 423, 425).  The examining physician noted normal breath sounds, good air movement, and no dyspnea. (Tr. 391, 395, 399, 405, 408, 411, 414, 417, 420, 423, 425).  He noted a normal heartbeat. (Tr. 391, 395, 399, 402, 405, 408, 411, 414, 417, 420, 423, 425).

As the ALJ discussed, Frasier presented at Birmingham Heart Clinic (hereinafter "BHC") on July 16, 2018.  (Tr. 25-26, 341).  Frasier's cardiologist recorded a medical history of atrial fibrillation, coronary artery disease, diabetes mellitus, hyperlipidemia, and hypertension.  (Tr. 341).  He stated Frasier "has been in his usual state of health." (*Id.*).  Though Frasier did not report exercising routinely, he remained "relatively active" building fences and bailing hay on his farm.  (*Id.*).  Frasier reported the development of fatigue in the heat, yet he denied chest pain.  (*Id.*).  He noted recent feelings of dizziness and a runaway heart rate.  (*Id.*).  Frasier admitted dyspnea on exertion, palpitations, and shortness of breath.  (Tr. 342).  The cardiologist noted Frasier appeared morbidly obese. (Tr. 343).  He recorded an irregular heartbeat without murmurs, rubs, or gallops.  (*Id.*).

Given a nuclear stress exam suggesting ischemia  (tr. 341), Frasier agreed to a catheterization procedure (tr. 343).   On August 10, 2018, Frasier underwent a percutaneous coronary intervention to the mid left anterior descending (LAD) artery using a stent.  (Tr. 359).

On September 13, 2018, Frasier visited his primary care physician to alter his medication regimen after the stenting procedure.  (Tr. 385).  Frasier reported "no chest pain, no arm pain on exertion, no shortness of breath when walking, no shortness of

breath when lying down, no palpitations, no known heart murmur, no lightheadedness, no calf or jaw pain, and no ankle edema." (Tr. 387). The examining physician noted Frasier appeared healthy, well-nourished, and well-developed. (*Id.*). He reported regular heart rate and rhythm. (*Id.*). In addition, he conducted a diabetic foot exam with normal findings. (Tr. 388). Frasier's A1C measured 7.9%. (*Id.*).

On December 4, 2018, Frasier reported decreasing his insulin by 4 units. (Tr. 384). He noted fasting blood sugar levels in the 90s "with extreme physical activity" but generally "in the 1 5170 [sic] range." (*Id.*). Frasier denied chest pain and fatigue. (*Id.*). The examining physician noted healthy appearance, normal breathing, and regular heart rate and rhythm. (*Id.*). He increased his insulin by 4 units. (*Id.*).

Frasier returned to BHC on March 20, 2019 for a follow-up visit. (Tr. 440). As on the previous occasion, the cardiologist noted Frasier appeared in his usual state of health and remained "relatively active." (*Id.*). An EKG revealed atrial fibrillation with controlled response. (*Id.*). Frasier reported experiencing "a great deal of bruising." In addition, "[h]e stat[ed] that he couldn't work an 8 [hour] day." (*Id.*). Specifically, he reported "getting fatigued after approx[imately] 4 [hours]," yet he denied chest pain. (*Id.*). The cardiologist noted Frasier possessed "rare tachycardia" and did not comply with treatment for sleep apnea. (*Id.*). Frasier admitted palpitations, dyspnea on exertion, and lower extremity edema. (Tr. 441). The cardiologist assessed normal breathing sounds and regular heart rate and rhythm. (Tr. 442).

On July 16, 2019, Frasier's primary care physician at TMC noted Frasier's "blood

sugars remained high since he started on insulin." (Tr. 378). Frasier reported no chest pain and no fatigue. (*Id.*). The physician noted healthy appearance, normal breathing sounds, and regular heart rate and rhythm. (Tr. 380). He increased Frasier's insulin dosage by 4 units. (Tr. 381).

A few days later, Frasier returned to TMC to discuss lab results. (Tr. 374). The examining physician noted A1C levels over 9% and instructed Frasier to follow his diet. (Tr. 375). Frasier reported no chest pain, no arm pain on exertion, and no fatigue. (Tr. 376). He appeared healthy and possessed a regular heart rate and rhythm. (*Id.*).

On October 17, 2019, Frasier presented for a diabetes follow-up. (Tr. 370). He reported no chest pain, no arm pain on exertion, and no fatigue. (Tr. 372). The physician noted healthy appearance, normal breathing sounds, and regular heart rate and rhythm. (Tr. 372-73). Frasier's A1C measured 7.1%. (Tr. 373). A diabetic foot exam reflected low risk. (*Id.*).

On the same day, Frasier returned to BHC for a follow-up visit. (Tr. 436). An EKG revealed atrial fibrillation with controlled response. (Tr. 436). Frasier explained two "events." (*Id.*). In the first, "[h]e was working hard in the heat and developed a 'burning pain' in the chest that resolved spontaneously." (*Id.*). A second event occurred "when he was also … out in the heat." (*Id.*). Frasier reported fatiguing easily but attributed it to his age. (*Id.*). In addition, Frasier admitted palpitations and dyspnea on exertion. (Tr. 437). The examining physician noted Frasier appeared overweight. (Tr. 438). He observed normal breathing sounds and regular heart rate and rhythm. (*Id.*).

On October 24, 2019, Frasier underwent a nuclear stress exam which returned normal findings and no evidence of ischemia.  (Tr. 431, 561).

Frasier was examined at the Urology Centers of Alabama on November 1, 2019.  (Tr. 445).  The examining physician noted no abnormalities on the exam.  (Tr. 447).

On January 6, 2020, Frasier returned to TMC with complaints of cough, congestion, and sore throat.  (Tr. 366).  Specifically, he reported sore throat; chest pain on exertion; cough, wheezing, and sputum production; muscle aches; and runny nose and nasal congestion.  (Tr. 368).  The physician noted Frasier's otherwise healthy appearance, normal breathing sounds, and regular heart rate and rhythm.  (Tr. 369).  A rapid strep test returned a positive result.  (Tr. 370).  A chest X-ray showed "peribronchial thickening favoring chronic airway disease" yet "[n]o obvious pneumonia or other acute process."  (Tr. 427).

On April 20, 2020, a few months prior to the alleged disability onset date, Frasier attended a telehealth appointment at TMC for diabetes and gastroesophageal reflux disease follow-ups.  (Tr. 26, 464).  Frasier reported "doing generally well with his sugars and his blood pressure" and noted an upcoming appointment with cardiology.  (Tr. 466).  The examining physician noted no chest pain, no arm pain on exertion, no shortness of breath when walking, no shortness of breath when lying down, no palpitations, no known heart murmur, no lightheadedness, no calf or jaw pain, and no ankle edema.  (*Id.*).  The physician labeled Frasier's diabetes without complications.  (*Id.*).

18

As the ALJ noted, Frasier returned to BHC on April 30, 2020.  (Tr. 26, 568).  He recounted experiencing good and bad days, and he reported dyspnea on exertion and "a little" arrhythmia.  (*Id.*).  The cardiologist reviewed Frasier's most recent nuclear study demonstrating normal findings.  (*Id.*).  Frasier denied shortness of breath or pleuritic chest pain.  (Tr. 569).  On examination, Frasier appeared well-nourished, breathed normally, and possessed regular heart rate and rhythm.  (Tr. 570).

On May 18, 2020, Frasier visited the Urology Centers of Alabama with the report of worsening and moderately bothersome symptoms of incontinence, nocturia, urgency, and urinary frequency.  (Tr. 451).  Frasier associated his symptoms with Jardiance.  (*Id.*).  The examining physician noted Frasier appeared obese, exhibited unlabored breathing, and displayed no symptoms of edema or cyanosis.  (Tr. 452).  His assessment included benign prostatic hyperplasia with lower urinary tract symptoms, overactive bladder, and urge incontinence of urine.   The physician prescribed oxybutynin for overactive bladder and stressed the importance of better sugar control.  (Tr. 453).

Gloria Sellman, MD, authored a medical evaluation on July 23, 2020.  (Tr. 60).  Sellman identified medically determinable impairments of non-severe essential hypertension, non-severe diabetes mellitus, severe ischemic heart disease, and non-severe diseases of esophagus.  (*Id.*).  Moreover, Sellman considered Frasier's statements regarding his symptoms partially consistent with the total medical and non-medical evidence in the file.  (Tr. 61).  Sellman opined Frasier could perform a range of medium

19

work with additional postural and environmental limitations.  (Tr. 61-63).

Medical records from the relevant period reflect similar findings.  On September 17, 2020, Frasier returned to TMC for a diabetes follow-up.  (Tr. 26, 460).  Frasier's BMI measured 35, and he reported his pain as 0/10.  (Tr. 460).  Frasier reported doing better, but he noted fasting glucose numbers over 200.  (Tr. 462).  He attributed his difficulty controlling his glucose level to a recent procedure on his foot and a series of family-related stressors.  (*Id.*).  He reported following his diet and maintaining a stable weight.  (*Id.*).  He reported no chest pain and no arm pain on exertion, no muscle pain or muscle weakness, and no fatigue.  (*Id.*).  He appeared well-nourished, had good air movement with no dyspnea, had regular heart rate and rhythm, and ambulated normally.  (*Id.*).  His exhibited grossly intact sensation and normal muscle strength.  (*Id.*).  The physician increased Frasier's insulin to 34 units and referred him to endocrine to aid in diet management.  (Tr. 463).

At an October 1, 2020, visit at BHC, Frasier admitted chest pain, palpitations, dyspnea on exertion, and shortness of breath.  (Tr. 26, 487, 574, 704, 795).  Frasier noted the pain "was severe in the summer but better now."  (Tr. 488, 575, 705, 796).  Frasier explained "[h]e [had] not been feeling well and had a great deal of stress recently," including the loss of a grandchild and an injury to his foot.  (Tr. 573, 794).  An EKG revealed atrial fibrillation with controlled response.  (*Id.*).  The cardiologist offered a catheterization procedure and intervention if indicated.  (Tr. 488, 575, 705, 796).  Frasier appeared obese and in no acute distress, breathed normally, possessed

normal heart rate and rhythm, showed no signs of edema, ambulated normally, stood without difficulty, and possessed normal mood and appropriate affect. (*Id.*).

On November 2, 2020, Frasier visited Anniston Medical Clinic (hereinafter "AMC") on referral from his primary care physician. (Tr. 476). Frasier reported fasting glucose levels in the 160s to 200s, with spikes into the 250s and above later during a day. (Tr. 479). Frasier's A1C measured around 10 about a month prior to the visit. (*Id.*). The examining physician attributed Frasier's frequent urination to hyperglycemia and Jardiance. He reduced Frasier's Jardiance prescription, changed Frasier's Trulicity prescription to Ozempic, ceased a Januvia prescription, and prescribed glimepiride. (*Id.*). Frasier's physical examination revealed normal heart and breath sounds. (Tr. 478).

From November 20 to November 21, 2020, Frasier obtained treatment at St. Vincent's East for a heart catheterization procedure. (Tr. 26, 513 ("He has had recurrent chest pressure with associated shortness of breath.")). Due to critical restenosis of a stent in the mid left anterior descending artery, Frasier underwent a successful percutaneous transluminal angioplasty and stenting of the left anterior descending artery with a drug-eluting stent. (Tr. 531). Lab results reflected normal levels of vitamin B-12. (Tr. 26, 779).

On December 1, 2020, Frasier returned to AMC for a diabetes recheck. (Tr. 539). Frasier reported fasting glucose readings averaging in the 150s and in the 180s to 200s later during a day. (Tr. 541). The examining physician increased Frasier's insulin to 38 units. (*Id.*). Frasier's chest and lung examination reflected normal findings. (Tr.

540).

Frasier visited BHC on December 3, 2020. (Tr. 580). Though Frasier reported experiencing dyspnea, he stated his symptoms "[were] a lot better following intervention." (*Id*.). In addition, he stated "he can get air now." (*Id*.). Frasier reported caring for 150 cattle and 50 hogs. (*Id*.). Frasier appeared obese and exhibited normal breath and heart sounds. (Tr. 582).

On March 3, 2021, Frasier returned to TMC for a yearly adult health exam. (Tr. 26, 646). Frasier's BMI measured 35.7 (Tr. 647). Frasier explained his fasting glucose levels would occasionally rise to 300 if he missed his insulin. (Tr. 649). He reported "[being] under a lot of stress." (*Id*.). He reported no chest pain, no muscle aches, no muscle weakness, no back pain, and no fatigue. (*Id*.). The examining physician noted healthy appearance; normal breathing with no dyspnea, wheezes, rales, crackles, or rhonchi; and regular heart rate and rhythm with no murmurs, rubs, or gallops. (*Id*.). The physician detected no musculoskeletal abnormalities, and he noted normal gait and station. Frasier's sensation appeared grossly intact. (*Id*.). His diabetes presented without complications. (Tr. 650).

Dr. Elizabeth Joe, MD, authored a medical evaluation on March 31, 2021. (Tr. 68). Dr. Joe identified medically determinable impairments of severe chronic ischemic heart disease with or without angina and severe diabetes mellitus. (Tr. 70). Moreover, Dr. Joe considered Frasier's statements regarding his symptoms partially consistent with the total medical and non-medical evidence in the file because the "[claimant] allege[d]

more limitation than [the medical evidence of record] support[ed]." (*Id.*).  Dr. Joe opined Frasier could perform a range of medium work with additional postural and environmental limitations.  (Tr. 71-73).

On April 1, 2021, Frasier reported increased and recurrent chest pain commencing the month following his receipt of the COVID-19 vaccine. (Tr. 733).  The pain reportedly occurred only with exertion.  (Tr. 733, 735-36).  Frasier reported "bad symptoms" two weeks prior, which he attributed to COVID-19.  (Tr. 736).  The cardiologist recommended a catheterization procedure and possible intervention.  (*Id.*).  Frasier agreed to proceed.  (*Id.*).  On April 5, Frasier received a COVID-19 nasal swab.  (Tr. 731).   On April 10, Frasier underwent another catheterization and stenting procedure.  (Tr. 600, 759).   Another medical record indicates Frasier experienced a "massive heart attack" necessitating the stent.  (Tr. 639, 672).

On April 26, 2021, Frasier presented at Riverview Medical Regional Center for an injury to his nose.  (Tr. 589).  Frasier "accidentally pressed [a] hydraulic pedal on his bobcat with his foot which caused a metal bar to fly up and hit him in the nose." (Tr. 26, 589).  He bled substantially.  (Tr. 589).  Though Frasier reported dull pain in his cervical spine (*id.*), the examining physician found no evidence of acute abnormalities (tr. 593).  Medical personnel repaired Frasier's laceration in the emergency department.  (Tr. 595).

On May 4, 2021, Frasier returned to AMC.  (Tr. 637, 670).  Frasier reported "doing much better because he [was] back on his medications." (Tr. 639, 672).  Frasier's

A1C measured 8.2%. (*Id.*). His chest and lung exam and cardiovascular exam returned normal findings. (Tr. 638, 671 ). The examining physician noted she would let Frasier stabilize and follow up in six to eight weeks. (Tr. 639, 672).

Medical notes from May 6 reflect Frasier required surgical intervention for his facial injury. (Tr. 674, 727). Frasier was advised to temporarily cease taking Plavix and Coumadin 8 and 5 days prior to surgery prior, respectively. (Tr. 675, 729; *see also* tr. 767 ("[T]here is some complication with coronary artery disease and he had a fresh stent placed just a few weeks prior to the injury[. W]e had to wait for enough time to pass for the stent to remain patent and we could get him off his anticoagulation for enough time to execute the surgical procedure. This was pretty much handled by his cardiologist in Birmingham.")). Frasier underwent nasal septal reconstruction. (Tr. 601, 767).

On June 14, 2021, Frasier returned to BHC. (Tr. 27, 665, 723). Frasier reported "doing reasonably well." He experienced one instance of severe chest pain, but "he was having them daily prior to intervention." (Tr. 665, 723). Frasier reported doing "what I want to" with respect to physical activity. (*Id.; see also* tr. 666, 726 ("He is not having any chest pain. He has had surgical intervention to his nose. He is back on Plavix. We will continue to follow.")). Frasier's examination included an overweight appearance, unlabored and clear breathing sounds, and regular heart rate and rhythm. (Tr. 725). He presented no edema in the extremities. (*Id.*).

Also on June 14, Frasier presented for a follow-up for benign prostatic

hyperplasia.  (Tr. 26, 660, 745).  Frasier noted symptoms of incontinence, nocturia, urgency, and urinary frequency made worse by Jardiance.  (Tr. 660, 745).  The physician adjusted Frasier's medications.  (Tr. 662, 747).

On August 4, 2021, Frasier presented at AMC for a recheck of his diabetes.  (Tr. 634, 654).  Frasier's chest and lung exam and cardiovascular exam returned normal findings.  (Tr. 635, 656).  Frasier reported fasting glucose levels generally in the 130s to 140s and in the 160s to 170s later during a day.  (Tr. 636, 657).  Two weeks prior, "his numbers were in the 200s quite frequently."  (*Id.*).  Frasier attributed the high fasting numbers to "eating things that he should not in excess, like corn."  (*Id.*).  The examining physician increased Frasier's insulin dosage to 44 units.  (*Id.*).

On September 9, 2021, Frasier attended an appointment at Core ENT for a check of his nasal fracture repair.  (Tr. 749).  Frasier reported doing well and described his breathing as "good."  (*Id.*).  He reported mild congestion due to being out in the hay field.  (*Id.*).  He noted lingering crusting and tenderness to the nose.  (*Id.*).  Frasier's respiratory and cardiovascular exams returned normal findings.  (Tr. 750).

On September 13, 2021, Frasier returned to BHC.  (Tr. 27, 652, 719).  According to treatment notes, "[patient] states that he has done well.  He has not had any further chest pain.  He is very active.  He isn't exercising but puts up hay.  He is doing well."  (Tr. 652, 719).  Moreover, Frasier reported no dyspnea on exertion.  (Tr. 653, 722).  Frasier's respiratory and cardiovascular exams returned normal findings.  (Tr. 721).  He presented no edema in the extremities.  (*Id.*).

25

Frasier presented for a diabetes follow-up on November 8, 2021. (Tr. 777). Frasier's chest and lung exam and cardiovascular exam returned normal findings. (Tr. 778). Frasier admitted failing to take his Jardiance prescription faithfully. (Tr. 779). In addition, he stated "he has not been eating as he should." (*Id*.). He reported fasting glucose generally in the 120s to 140s and in the 120s to 250s later during a day. The examining physician added NovoLog on a sliding scale to Frasier's regimen. (*Id*.).

Krishna Reddy, MD, authored a medical evaluation on November 19, 2021. (Tr. 75). Reddy assessed severe chronic ischemic heart disease with or without angina and severe diabetes mellitus. (Tr. 77). In addition, she found Frasier's statements regarding his symptoms partially consistent with the total medical and non-medical evidence in the file. (Tr. 78). Specifically, she stated the medically determinable impairments in the file could be expected to produce some of the noted limitations, but not to the extent noted by the claimant. (*Id*.). Reddy opined Frasier could perform a range of medium work with additional postural and environmental limitations. (Tr. 78-80).

On December 9, 2021—just prior to the date last insured—Frasier presented at AMC for a diabetes follow-up and recheck of hypertension and hyperlipidemia. (Tr. 774). Frasier reported taking his medications faithfully. (Tr. 776). He noted fasting glucose levels in the 130s to 160s with a few isolated 200s and 130s to 180s with a few isolated 200s later during a day. (*Id*.). Frasier stated he rarely required Novolog. (*Id*.). The examining physician increased Frasier's insulin dosage to 48 units. (*Id*.). Frasier's chest and lung exam and cardiovascular exam returned normal findings. (Tr. 775).

On February 18, 2022 (after the date last insured), Frasier presented at AMC for a diabetes follow-up and a recheck of hypertension and hyperlipidemia. (Tr. 771). The examining physician wrote, "The patient had a week where his fasting glucose levels were in the 170s; later in the low 200s. We do not know if it was because he was having pain from the weather changes or because he had a viral infection. That has since resolved and fasting glucose levels have now been 120s to 160s; later, 110s to 170s with a few in the low 200s." (Tr. 773). He increased Frasier's insulin dosage to 52 units at bedtime. (*Id.*). Frasier's chest and lung exam and cardiovascular exam returned normal findings. (Tr. 772).

On March 14, 2022, Frasier presented at BHC for a return office visit. (Tr. 27, 780). Frasier stated "I ain't good for sh**" and reported low energy levels since April 2021. (Tr. 780). Though Frasier experienced pain prior to the last stent, he denied any current chest pain. (*Id.*). That said, Frasier reported symptoms of "fluttering," fatigue, and weakness, and he observed his diabetes "has been difficult to manage." (Tr. 780, 783). Frasier continued to manage 120 head of cattle and hogs and run heavy mechanical equipment. (Tr. 780). He noted difficulty climbing into trucks. (*Id.*). Frasier's respiratory and cardiovascular physical exam reflected normal findings. (Tr. 782). The physician noted no evidence of lower extremity edema or abdominal tenderness. (Tr. 782-83). His BMI measured 37. (Tr. 782).

On May 23, 2022, Frasier returned to AMC for a recheck of his diabetes. (Tr. 810). The examining physician labelled Frasier's diabetes mellitus with hyperglycemia

uncontrolled.  (Tr. 813).  Frasier's A1C rose from 8.2% in December to 9.5%.  (*Id.*).

Frasier told the examining physician "he has been snacking a lot and he believes this

has caused weight gain and hyperglycemia."  (*Id.*).  In addition, he admitted skipping

Tresiba on occasion.  (*Id.*).  Frasier recounted a recent tick bite requiring antibiotic

treatment and stated he became concerned about his fasting glucose levels dropping

too much.  (*Id.*).  The examining physician advised Frasier to take Tresiba unless his

sugar measured below 150, and he increased Frasier's Ozempic dosage to 2 mg once a

week to address an increased appetite.  (*Id.*).  Frasier's chest and lung exam and

cardiovascular exam reflected normal findings.  (Tr. 812).

On May 25, 2022, Frasier underwent a nuclear stress exam at BHC.  (Tr. 809).

The test reflected abnormal findings.  (*Id.*).  Specifically, the test suggested ischemia in

the distribution of a left anterior descending diagonal.  (*Id.*).

From June 26, 2022 to July 1, 2022, Frasier was hospitalized at St. Vincent's East.

(Tr. 817).  The examining physicians assessed "acute pancreatitis likely from Ozempic,

now stopped."  (*Id.*).  In addition, the examining physicians performed a catheterization

procedure following Frasier's complaints of chest pain; the procedure portrayed three-

vessel coronary artery disease.  (*Id.*).  Discharge notes reflect a "[s]taged procedure

planned in 2 weeks."  (*Id.*; *see also* tr. 858 ("LHC today w/findings of stenosis of D2,

will need intervention in 2 weeks"); tr. 335 (Mr. Frasier has contacted our firm to report

that he was hospitalized at St. Vincent's East … for his heart and pancreatitis.  He was

discharged on July 1, 2022.")).

The records above—considered as a whole—provide substantial evidence to support the ALJ's RFC determination, and the ALJ properly cited objective medical evidence refuting the severity of Frasier alleged symptoms.

Regarding his alleged symptoms of low back pain, Frasier testified "it hurts to bend over." (Tr. 45). As an initial matter, the ALJ determined Frasier did not manifest a medically determinable impairment of low back pain through the date last insured, because "[t]he claimant's reports of pain are a symptom and not an impairment" and "the record contains no objective medical evidence or diagnosis to establish low back pain." (Tr. 23). *See also* SSR 16-3p, 2017 WL 5180304, *4 (Oct. 25, 2017) ("If an individual alleges symptoms, but the medical signs and laboratory findings do not substantiate any medically determinable impairment capable of producing the individual's alleged symptoms, we will not evaluate the individual's symptoms" at the next step of the evaluation process).

Even if a medically determinable impairment of low back pain could be established, the record contradicts the alleged severity of Frasier's symptoms. A physician assessed low back pain prior to the alleged disability onset date. (Tr. 400). However, on September 17, 2020, Frasier reported no muscle pain or weakness. (Tr. 462). In addition, he ambulated normally, his sensation appeared grossly intact, and his muscle strength appeared normal. (*Id.*). Likewise, medical records dating October 1, 2020, demonstrate Frasier ambulated normally and stood without difficulty. (Tr. 488, 575, 705, 796). On March 3, 2021, Frasier reported no muscle aches, no muscle

weakness, and no back pain.  (Tr. 649).  The physician detected no musculoskeletal abnormalities, and he noted normal gait and station.  (Tr. 649).  Finally, Frasier reported dull pain in his cervical spine on April 26, 2021 (tr. 589), but the examining physician found no evidence of acute abnormalities (tr. 593).  Thus, the record contains substantial evidence buttressing the ALJ's evaluation of Frasier's testimony regarding his back pain.

Regarding his type II diabetes, Frasier explained he contracts a headache and "just sit[s] in [a] chair all day" when his glucose level rises too high.  (Tr. 45).  The ALJ determined Frasier could not establish migraines or primary headache disorder as a medically determinable impairment.  (Tr. 23).  *See* SSR 19-4p, 2019 WL 4169635, *4 (Aug. 26, 2019) ("physicians diagnose a primary headache disorder only after excluding alternative medical and psychiatric causes of a person's symptoms").  Insofar as Frasier alleged his headaches stemmed from high glucose levels, the medical record does not appear to contain any objective reports or assessments confirming these allegations. Moreover, Frasier remained active during the relevant period, contradicting his statement that his headaches confined him to a chair.  (*See* tr. 341, 440, 652, 719).  As such, Frasier's observations do not comport with the medical evidence in the file.

When asked about the adverse symptoms associated with his heart, Frasier testified, "I'm in atrial [fibrillation] *all the time*…. [My heart] will run away and it feels like you worked two days in 20 minutes."  (Tr. 43, emphasis added).  In addition, Frasier surmised he would require another stenting procedure because "I'm getting where I

can't breathe again and that's usually a sign it's happening." (*Id.*).  Frasier explained he could stand or walk for about thirty minutes to an hour before stopping to rest.  (Tr. 45).  Though aspects of the record certainly confirm symptoms of runaway heart rate, chest pain, shortness of breath, and fatigue, substantial evidence suggests these symptoms did not manifest constantly during the relevant period.  Principally, Frasier reported improved symptoms after cardiac intervention, and he exhibited normal heart rate and rhythm on several occasions.

Prior to the alleged onset date, Frasier admitted palpitations and dyspnea on exertion (tr. 437, 441), and an EKG revealed atrial fibrillation with controlled response. (Tr. 436, 440).  Frasier explained two "events." (Tr. 436).  In the first, "[h]e was working hard in the heat and developed a 'burning pain' in the chest that resolved spontaneously." (*Id.*).  A second event occurred "when he was also … out in the heat." (*Id.*).  However, a subsequent nuclear stress exam returned normal findings and no evidence of ischemia.  (Tr. 431, 561).

On October 1, 2020, Frasier again admitted chest pain, palpitations, dyspnea on exertion, and shortness of breath.  (Tr. 26, 487, 574, 704, 795).  An EKG revealed atrial fibrillation with controlled response.  (Tr. 573, 794).  After a successful catheterization and stenting procedure in November 2020, Frasier reported experiencing lingering dyspnea but stated his symptoms "[were] a lot better following intervention."   (Tr. 580).  In addition, he noted "he can get air now." (*Id.*).

In April 2021, Frasier underwent another catheterization and stenting procedure.

(Tr. 600, 759). Subsequently, Frasier visited his cardiologist and reported "doing reasonably well." (Tr. 27, 665, 723). In particular, he experienced one instance of severe chest pain compared to daily instances of chest pain prior to intervention. (Tr. 665, 723.). Frasier reported doing "what I want to" with respect to physical activity. (*Id.*). His physical examination featured unlabored and clear breathing sounds and regular heart rate and rhythm. (Tr. 725). In September 2021, Frasier reported no chest pain or dyspnea on exertion. (Tr. 652-53, 719-22). As the cardiologist observed, "[Frasier] is very active. He isn't exercising but puts up hay. He is doing well." (Tr. 652, 719). In November 2021, December 2021, and February 2022, Frasier's respiratory and cardiovascular exams returned normal findings. (Tr. 772, 775, 778).

After the date last insured, Frasier told his cardiologist "I ain't good for sh**" and reported low energy levels since April 2021. (Tr. 780). However, this testimony at least partially contradicts prior records in which Frasier reported feeling well and remaining physically active after April 2021. (*See, e.g.,* tr. 652, 665, 719, 723). Moreover, Frasier reported symptoms of "fluttering" but denied any current chest pain. (Tr. 780). He noted difficulty climbing into trucks, yet he also reported managing 120 head of cattle and hogs and running heavy mechanical equipment. (*Id.*). And as before, his respiratory and cardiovascular exams reflected normal findings. (Tr. 782).

In May 2022, a nuclear stress exam suggested ischemia. (Tr. 809). From June 26 to July 1, 2022, Frasier was hospitalized, and discharge notes reflect a scheduled surgical intervention. (Tr. 817, 858). However, because these records post-date the

date last insured, they are pertinent only insofar as the information bears on the claimant's disability during the relevant time. *Douglas,* 486 Fed. App'x at 75. Moreover, records during the relevant period suggest surgical intervention would generate a marked improvement in Frasier's symptoms.

Though Frasier complained of fatigue during the relevant period, he also routinely denied experiencing fatigue altogether. For example, on March 20, 2019, Frasier "stat[ed] that he couldn't work an 8 [hour] day" and reported "getting fatigued after approx[imately] 4 [hours]." (Tr. 440). Likewise, on October 17, 2019, Frasier reported fatiguing easily but attributed it to his age. (Tr. 436). On March 14, 2022, Frasier reported low energy levels since April 2021 and noted symptoms of fatigue and weakness. (Tr. 780, 783). At that time, however, Frasier continued to manage 120 head of cattle and hogs and run heavy mechanical equipment. (Tr. 780). Frasier also reported no fatigue on December 4, 2018; July 16, 2019 (and again later that month); October 17, 2019; September 17, 2020; and March 3, 2021. (Tr. 372, 376, 378, 384, 462, 649). Based upon the foregoing review, the medical record reveals substantial evidence to support the ALJ's evaluation of Frasier's testimony regarding his symptoms of atrial fibrillation, shortness of breath, and fatigue.

Regarding Frasier's confirmed history of obesity, the ALJ found "no substantial evidence that the claimant's obesity precludes him from work." (Tr. 25). Specifically, the ALJ noted "no treating physician has placed any permanent restrictions on the claimant due to his obesity." (*Id.*). Therefore, "the claimant's obesity does not

significantly interfere with his ability to perform physical activities or routine movement[,] and … [the claimant] maintains the ability to perform the range of work outlined by the residual functional capacity adopted herein." (*Id.* (citing SSR 19-2p)). As discussed previously, treatment notes highlighting Frasier's normal muscle strength, sensation, and ambulation buttress this finding. (*See, e.g.,* tr. 462, 488, 575, 649, 705, 796).

The ALJ also properly evaluated the medical source opinions of state agency consultants Gloria Sellman, M.D.; Elizabeth Joe, MD.; and Krishna Reddy, M.D. (Tr. 28). All three experts opined Frasier could perform work at the medium exertional level with the additional postural and environmental limitations outlined previously. (*See* tr. 61-63, 71-73, 78-80). The ALJ considered the experts' opinions persuasive, as they appeared consistent with the medical evidence of record and Frazier's admitted activities of daily living. (Tr. 28). Thus, the ALJ accounted for the experts' opinions in his RFC assessment to the extent they fully accorded with his own conclusions vis-à-vis Frasier's limitations. Drs. Sellman, Joe, and Reddy's opinions thus constitute substantial evidence supporting the ALJ's RFC determination.

The ALJ discussed many—though certainly not all—of the foregoing records. Accordingly, Frasier asserts the ALJ selectively evaluated the medical record and failed to consider evidence consistent with his own allegations. *See Robinson v. Colvin*, No. 5:12-cv-1954-AKK, 2014 WL 2214294203, at *5 (N.D. Ala. May 28, 2014) ("[I]t was unreasonable for the ALJ to rely only on the small snapshot of treatment notes that

showed improvement immediately after [claimant's] back surgery, and to ignore the later notes outlining the return of [claimant's] pain.").

As an initial matter, the ALJ need not explicitly discuss every potentially relevant medical record. *See Brito v. Comm'r, Soc. Sec. Admin.*, 687 F. App'x 801, 804 (11ᵗʰ Cir. 2017) ("Although [claimant] points to other evidence in the record that was consistent with her hearing testimony and to which the ALJ did not specifically refer in making her credibility determination, the ALJ was not required to examine or reference every piece of evidence, so long as it is evident, as it is here, that the ALJ considered [her] medical condition as a whole.").

Contrary to Frasier's contention, the ALJ did not cherry-pick the records to support his own conclusion.  First, the ALJ did not improperly disregard evidence buttressing Frasier's testimony.  In fact, he noted several instances in which Frasier complained of adverse symptoms.  For instance, the ALJ cited records prior to the alleged onset date wherein Frasier "reported experiencing some fatigue[ and] occasional heart palpitations when working in the heat."  (Tr. 25-26).  Moreover, the ALJ referred to a record dated October 1, 2020, wherein Frasier "presented … with complaints that he was not feeling well in that he had been experiencing chest pain."  The same record went on to state Frasier "had been under a lot of stress."  (Tr. 26).  Furthermore, "[n]otes showed the most recent EKG demonstrated atrial fibrillation with controlled response," necessitating a left heart catheterization procedure. *Id.*  Finally, the ALJ cited records dating March 2022 wherein Frasier "complained of lack of energy, heart

fluttering, and difficulty managing his diabetes." (Tr. 27).

Second, the ALJ assessed a residual functional capacity including significant exertional and non-exertional limitations. In particular, the ALJ determined Frasier could not perform past relevant work as an auto tire wheel repairer. (Tr. 28). According to his Work History Report, Frasier's previous job required frequent walking, standing, climbing, and crouching, and heavy lifting. (Tr. 253). By contrast, the ALJ's RFC determination recognized Frasier's inability to perform heavy work. (Tr. 24). Moreover, although the ALJ determined Frasier could perform medium work, such labor could not include climbing ladders, ropes, and scaffolds, or traversing unprotected heights. (*Id.*). Finally, the ALJ accounted for some limitations in stooping, crouching, crawling, and kneeling. (*Id.*). As such, the RFC determination accurately reflects Frasier's impairments as supported by the record.

In sum, Frasier has not successfully undermined the substantial evidence supporting the ALJ's RFC assessment. Although Frasier maintains his symptoms limit him to a greater degree than the ALJ assessed, the court cannot reweigh the evidence or second-guess the ALJ's conclusions. *See Winschel*, 631 F.3d at 1178 (citations and internal quotation marks omitted). Thus, the ALJ did not err in assessing Frasier's subjective complaints, and Frasier's contrary interpretation of the evidence does not warrant reversal.

Relatedly, Frasier faults the ALJ's characterization of his daily activities in rendering his adverse credibility determination. (Doc. 13 at 10). According to Frasier,

the ALJ improperly described his daily living activities without acknowledging the corresponding limitations articulated in his testimony.

The pertinent portion of the ALJ's opinion reads:

> The cumulative record simply fails to support disabling functional limitations. As stated above, the claimant described daily activities that are not consistent with the degree of restrictions alleged. Indeed, throughout the pertinent period, the claimant appeared capable of living independently within his household, adequately tending to his personal care needs, performing chores around the farm, doing occasional yard work, attending church, and spending time with his family and grandchildren.

(Tr. 27).

Relying on *Horton v. Barnhart*, 469 F. Supp. 2d 1041 (N.D. Ala. 2006), Frasier contends the ALJ improperly failed to observe the limitations he described vis-à-vis his activities of daily living. *See* doc. 13 at 11 ("He explained his day consists of about 3-4 hours of 'trying to do something' like riding in a truck. The Plaintiff testified he just checks on his cattle but his grandkids feed them. The Plaintiff reported he can sweep the floor but only for 20 minutes. He also reported he can sometimes mow the grass for an hour. He testified at times he spends hours lying down during the day." (citations omitted)). Although the ALJ did not recite certain limitations Frasier highlights, such omissions do not undermine the substantial evidence buttressing his decision.

The ALJ may consider the claimant's daily activities as one factor in evaluating subjective complaints. *See* 20 C.F.R. § § 404.1529(c)(3)(i), 416.929(c)(3)(i); *Majkut v. Comm'r of Soc. Sec.,* 394 F. App'x 660, 663 (11th Cir. 2010) ("Although a claimant's

admission that she participates in daily activities for short durations does not necessarily disqualify the claimant from disability, that does not mean it is improper for the ALJ to consider a claimants daily activities at all."); *Harrison v. Comm'r of Soc. Sec.,* 569 F. App'x 874, 880 (11th Cir. 2009) (finding the claimant's daily activities of managing his personal care, preparing meals, shopping, caring for pets, watching television, using a computer, and socializing with others supported ALJ's credibility determination).

In *Horton,* the court noted the ALJ erred by selectively and disingenuously describing the claimant's daily living activities in rendering his adverse credibility determination, "as he accept[ed] her listing of her activities, but not her limiting description of them." *Horton,* 469 F. Supp. 2d at 1047. More specifically, the ALJ noted the claimant could drive a car and perform household chores; however, he omitted reference to the claimant's qualification that she could not drive far distances, and she performed chores "infrequently and sporadically, taking much longer to complete." *Id.* at n.2. The court thus concluded substantial evidence failed to support the ALJ's justifications for discrediting the claimant's testimony. *Id.* at 1047.

Significantly, however, apart from his "disingenuous" description of the claimant's daily living activities, the only other evidence the ALJ in *Horton* latched upon to support his adverse credibility determination constituted a physician's opinion—which the court concluded the ALJ improperly rejected. *Id.* at 1045-47. Thus, the ALJ erroneously evaluated the claimant's subjective complaints in *Horton* because "the ALJ relied entirely on the [claimant's] daily activities in rejecting her pain testimony and

allegation of debilitating pain, after improperly rejecting an opinion of the plaintiff's physician." *Hart v. Soc. Sec. Admin.*, No. 5:19-cv-00811-SGC, 2021 WL 961786 (N.D. Ala. Mar. 15, 2021) (discussing the narrow context of the court's reasoning in *Horton*).

The court does not confront the same deficiencies in the case at bar because the ALJ properly detailed medical records evincing substantial evidence for the determination Frasier's symptoms do not preclude employment. *Hunter v. Colvin*, No. 4:13-CV-0391-SLB, 2014 WL 4458887 (N.D. Ala. Sept. 8, 2014) (contrary to the ALJ's conclusion, the claimant's daily living activities did not undermine her subjective complaints; however, substantial evidence nevertheless buttressed the ALJ's decision because he also relied upon sufficient objective medical evidence to render his adverse credibility determination). Accordingly, the ALJ's decision in the instant case does not manifest the concerns at issue in *Horton*.

The decision in *Iheanacho v. Berryhill*, No. 6:17-cv-0910-MHH, 2018 WL 4680173 at *8-9 (N.D. Ala. Sept. 28, 2018), presents similar distinguishable circumstances. Among other examples, the ALJ ignored testimony demonstrating the claimant completed household chores infrequently and with great difficulty. As such, the court found, "The ALJ's brief summary of Ms. Iheanacho's daily activities does not represent solely the limitations caused by Ms. Iheanacho's pain." *Id.* at *9. That said, the court *also* concluded the ALJ improperly characterized the objective medical evidence. *Id.* at *4-7. Procedurally, therefore, the court could not "affirm the ALJ's decision based solely on her evaluation of Ms. Iheanacho's daily activities." *Id. at 8.*

By contrast, the ALJ's evaluation of Frasier's daily activities followed a determination, based on substantial evidence, that the objective medical evidence did not support Frasier's allegations of disabling symptoms. *See Garcia v. Kijikazi*, No. 5:22-cv-1396-LCB, 2023 WL 8439742 (N.D. Ala. Dec. 5, 2023) ("[I]t is apparent that the ALJ did not rely *solely* on [the claimant's] reported daily activities in finding that she was not disabled. Accordingly, [the ALJ's] decision was not in violation of the rules discussed in *Horton* and *Iheanacho*.") (emphasis in original).

Moreover, based upon the statements in Frasier's Function Report and hearing testimony, the ALJ's description of daily living activities manifests as neither selective nor disingenuous.

As an initial matter, Frasier's stated limitations do not appear to bear on living independently within the household, tending to personal care, attending church, or spending time with family. Regarding performing household chores and occasional yardwork, Frasier's stated limitations conflict with his own accounts of daily activities elsewhere in the record.

At the evidentiary hearing, Frasier testified his day consists of about 3-4 hours of "try[ing] to do anything" like riding in a truck. (Tr. 46). Regarding caring for his cattle, Frasier stated he directs his family members "what they need to do and where." (Tr. 47). Furthermore, he explained he "sit[s] in [a] chair all day" when his blood pressure gets too high (Tr. 45). In a Function Report completed about a month prior to the alleged onset date, Frasier reported sweeping for approximately 20 minutes and

mowing for approximately an hour.  (Tr. 242).[2]  In a Function Report dated February 17, 2021, Frasier stated he could no longer cut hay, bale hay, feed cows, or fix his fence due to his conditions.  Moreover, he noted his wife and children performed his household's chores and yardwork.  (Tr. 281).

Despite this testimony, the entire record suggests Frasier exercised, completed household chores, and performed yardwork with greater regularity.  For example, in his February 17, 2021, Function Report, Frasier listed walking outside as a daily activity.  (Tr. 280, 282).[3]  On July 16, 2018, prior to the alleged onset date, Frasier presented at Birmingham Heart Clinic "in his usual state of health."  (Tr. 341).  The cardiologist noted Frasier remained "relatively active" building fences and bailing hay on his farm.  (*Id.*).  Treatment notes dating March 20, 2019 reflect similar findings.  (Tr. 44).  On December 3, 2020, Frasier reported caring for 150 cattle and 50 hogs.  (Tr. 580).  Medical records dating April 26, 2021, indicate Frasier operated the hydraulic pedal on a bobcat.  (Tr. 589).  On June 14, 2021, Frasier reported doing "what I want to" with respect to physical activity.  (Tr. 665, 723).  On September 9, 2021, ENT treatment notes indicate Frasier experienced nasal congestion due to presence in a hay field.  (Tr.

---

[2] In his brief, Frasier frames the listed time periods as strict upper limits.  (*See* doc. 13 at 11 ("The Plaintiff reported he can sweep the floor but *only* for 20 minutes.  He also reported he can *sometimes* mow the grass for an hour." (emphasis added)).  However, the Function Report form merely queries how much time the claimant's household chores typically take to complete.  (*See* tr. 242 ("How much time does it [*i.e.*, any previously listed household chores] take you, and how often do you do each of these things?")).

[3] Frasier also stated he could walk 100 yards before stopping to rest for 2-3 minutes.  (Tr. 284).  However, at the evidentiary hearing, he stated he could walk 30 minutes to an hour before stopping to rest.  (Tr. 45).

749).  Relatedly, cardiology notes dating September 13, 2021, indicate Frasier remained "very active … put[ting] up hay."  (Tr. 653, 722).  Finally, on March 14, 2022, after the date last insured, Frasier reported symptoms of heart fluttering, fatigue, weakness, and difficulty climbing into trucks.  (Tr. 780).  Nevertheless, he continued to manage 120 head of cattle and hogs and run heavy mechanical equipment.  (*Id.*).

In summary, Frasier fails to establish the ALJ's discussion of his daily activities renders improper his assessment of his subjective complaints.  Although the ALJ did not recite each limitation Frasier included in his testimony, he accurately summarized the relevant portions of the hearing and fairly represented the pertinent statements in the Function Report.  *See Byars v. Colvin*, No. 6:15-CV-00303-KOB, 2016 WL 4137981 (N.D. Ala. Aug. 4, 2016) (in discussing the claimant's pain allegations, the ALJ did not improperly omit the claimant's testimony regarding specific limitations on her daily living activities because her Function Report contradicted her testimony).

Furthermore, the evidence regarding Frasier's daily living activities did not constitute the sole justification for the ALJ's adverse credibility determination.  As elaborated previously, the ALJ buttressed his determination with a detailed discussion of medical evidence undermining the conclusion Frasier sustains disabling symptoms. Accordingly, the ALJ's decision rests upon substantial evidence.  *See Strickland v. Comm'r of Soc. Sec.,* 516 F. App'x 829, 832 (11th Cir. 2013) (the claimant's daily living activities, coupled with her medical evidence, supported the ALJ's adverse credibility determination); *Dyer v. Barnhart*, 395 F.3d 1206, 1212 (11th Cir. 2005) (the ALJ properly

considered the claimant's subjective complaints of pain); *Hart*, 2021 WL 961786, at *7 (Although the ALJ did not delineate the specific limitations associated with the claimant's reported daily activities, he nevertheless properly assessed her credibility because his reference to her daily living activities "was preceded by a lengthy discussion on how the objective medical evidence and treatment notes" belied her allegations of disabling pain.); *Eubanks v. Berryhill,* No. 5:16-CV-1487-VEH, 2017 WL 5187835 at *3-4 (N.D. Ala. Nov. 9, 2017) (substantial evidence supported the ALJ's credibility assessment because he properly considered the claimant's daily living activities together with the objective medical evidence); *Davis-Baker v. Colvin*, No. 1:14-cv-1854-AKK, 2015 WL 3833819 (N.D. Ala. June 22, 2015) (substantial evidence buttressed the ALJ's adverse credibility determination because the ALJ did not mischaracterize the evidence vis-à-vis the claimant's daily living activities, nor did he improperly rely solely upon the claimant's daily living activities to assess her credibility as he analyzed the objective medical evidence).

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision. The court will enter a separate final judgment.

**DONE** this 1st day of August, 2024.

HERMAN   N.   JOHNSON,   JR.
UNITED STATES MAGISTRATE JUDGE